UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 4:94-CR-121(1)-Y |
| | § | |
| BRUCE CARNEIL WEBSTER, | § | |
| | § | |
| Defendant, | § | |

**ORDER**

The matters before the court are (1) Bruce Carneil Webster's motion to modify sentence, styled as "Joint Advisory to the Court" to Modify Sentence, filed April 30, 2021 (ECF no. 1216); (2) the Pro Hac Vice Applications filed April 30, 2021 by Webster's counsel (ECF nos. 1213 & 1215); and (3) the Motion to withdraw Pro Hac Vice Application filed April 30, 2021 (ECF no. 1214). For the reasons explained below, Webster's motion to modify his death sentence will be dismissed for want of jurisdiction and his accompanying pro-hac-vice applications dismissed as moot.

Background

In September 1994, Bruce Carneil Webster participated, along with other members of a gang of Arkansas drug dealers, in an interstate rampage of rape, kidnapping, and murder. Webster's capital offense began in Dallas, Texas, when he and several others kidnaped the sixteen-year-old sister of a local drug dealer who had cheated Webster's gang on a drug transaction, and ended two days later with Webster's stripping the victim, who had been sexually assaulted on numerous occasions since her abduction, beating her with a shovel, forcing her body (probably still alive) into a grave, pouring gasoline over her, and then shoveling dirt over her. *United States*

*v. Webster*, 162 F.3d 308, 318-19 (5th Cir. 1998).  Webster was tried separately from his co-defendants.  A jury convicted Webster of (1) kidnaping in which a death occurred; (2) conspiracy to commit kidnaping; and (3) using and carrying a firearm during a crime of violence.

At the conclusion of a separate punishment-phase trial, the same jury concluded *unanimously* that the following aggravating factors existed: (1) Webster committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of the victim; (2) after substantial planning and premeditation, Webster committed the offense of kidnaping in which the death of the victim resulted; (3) the victim was particularly vulnerable due to her age; (4) Webster constitutes a future danger to the lives and safety of other persons; and (5)  the effect of the instant offense on the victim's family.  *Webster*, 162 F.3d at 319 n.1.

The jury also *unanimously rejected* the following arguments submitted by the defense as proposed mitigating factors: (1) *Webster's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired*; (2) Webster was under unusual and substantial duress; (3) Webster does not a prior history of other criminal conduct; (4) Webster committed the offense under severe mental or emotional disturbance; (5) *Webster, as a result of personality disorder, a mental illness, and/or low intellectual functioning, has a lesser capability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law than that of a normal person*; (6) Webster was youthful at the time of the commission of the crime, although not under the age of eighteen; (7) Webster has talents, capabilities, or qualities which are of some value to society (such as musical talents, religious devotion, etc.); (8) *Webster is unduly susceptible to influence by others*; (9) Webster can be of some productive value in a prison setting; (10) Webster does not have a significant prior history

of violent crime; and (11) Webster is the product of an impoverished background which virtually precluded his integration into the social and economic mainstream of the community.  *Id.*, at 319 n.2. (Emphasis added.)

This court found, based in part on the fact that only four of the twelve jurors found Webster was mentally retarded, that Webster had failed to carry his burden of establishing that he was exempt from the death penalty under 18 U.S.C. § 3596(c).  The United States Court of Appeals for the Fifth Circuit affirmed this Court's factual finding regarding Webster's failure to establish his mental retardation.  *Id.*, at 352-53.  Whether a criminal defendant is intellectually disabled is a question of fact.  *Matamoros v. Stephens*, 783 F.3d 212, 216 (5th Cir. 2015); *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010).  After the Fifth Circuit affirmed Webster's conviction and sentence on direct appeal, the United States Supreme Court denied his petition for writ of certiorari.  *Webster v. United States*, 528 U.S. 829 (1999).

In *Atkins v. Virginia*, 536 U. S. 304 (2002), the United States Supreme Court concluded the execution of mentally retarded persons failed to fulfill either of the two justifications for capital punishment--retribution and deterrence--and held that the Eighth Amendment forbids the execution of mentally retarded persons.  *Atkins*, 536 U. S. at 318-21.  The Supreme Court cited two clinical definitions of "mental retardation" with approval[1] but, ultimately, left to the States

---

[1] In a footnote in *Atkins*, the Supreme Court identified two clinical definitions of "mentally retarded" as follows:

The American Association on Mental retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work.  Mental retardation manifests before age 18."  Mental Retardation, definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The American Psychiatric Association's definition is similar.  "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B).

"the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."[2] *Id.*, 536 U. S. at 317.  Significantly, the reasons the Supreme Court used to justify a constitutional ban on the execution of the mentally retarded included that mentally retarded individuals (1) have diminished capacities to (a) communicate, (b) abstract from mistakes and learn from experience, (c) engage in logical reasoning, (d) control impulses, and (e) understand the reactions of others; (2) often act on impulse rather than pursuant to a premeditated plan; and (3) in group settings are followers rather than leaders.  *Id.*, at 318.

At Webster's trial, this court's jury instructions were designed to ensure that the jury gave maximum consideration to all of Webster's proffered mitigating evidence.  *Webster*, 162 F.3d at 327 ("The instructions left no room for the jury to ignore constitutionally relevant evidence.").  Furthermore, the jury's unanimous factual findings at the punishment phase of trial made clear it believed Webster (1) did not suffer from any significant impairment in his ability to understand the wrongfulness of his conduct or to conform his behavior to the requirements of the law and (2) did not suffer from an impediment which rendered him unduly susceptible to the influence or control  of others.  Furthermore, the evidence at trial amply demonstrated that at the critical junctures in Webster's capital offense, i.e., the abduction of Lisa Rene and her actual murder, Webster took a leadership role in his gang's premeditated activities.  It was Webster who look the lead in gaining entry into Lisa Rene's apartment and it was Webster alone who forced Lisa Rene

---

The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."  Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).  "Mild mental retardation is typically used to describe people with an IQ of 50-55 to approximately 70.  *Id.*, at 42-43.

*Atkins v. Virginia*, 536 U.S. at 309 n.3.

[2] In *Bobby v. Bies*, 556 U. S. 825 (2009), the Supreme Court pointed out that *Atkins* did not provide definitive procedural or substantive guides for determining when a person who claims intellectual disability will be so impaired as to fall within *Atkins'* compass.  *Bobby v. Bies*, 556 U.S. at 831.

4

into her gave, stripped her, poured gasoline over her body, and covered her with dirt.  Thus, the concerns expressed by the Supreme Court in *Atkins* as justifying disparate punishment for mentally retarded capital offenders were simply not present with regard to Webster's capital offense.

Webster next filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 and later filed an amended motion, arguing in part that the Supreme Court's intervening decision in *Atkins* warranted setting aside his death sentence.  This court denied Webster's amended motion to vacate in a lengthy Memorandum Opinion and Order issued September 30, 2003 (ECF no. 1110).  Despite denying relief on all claims, on January 28, 2004, this court granted Webster a Certificate of Appealability on two claims: that he is ineligible for the death penalty because he is mentally retarded and that there was insufficient evidence at trial to support's this court's finding that Webster was not mentally retarded (ECF no. 1119). The Fifth Circuit affirmed this court's denial of relief under § 2255.  *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005).[3]  The United States Supreme Court once again denied Webster's petition for writ of certiorari.  *Webster v. United States*, 549 U.S. 828 (2006).

Webster thereafter sought permission from the Fifth Circuit to file a successive Section 22554 motion again raising the claim that he is mentally retarded and arguing that he had newly discovered evidence to support his claim.  The Fifth Circuit denied that request, holding the plain language of Section 2255(h)(1) foreclosed Webster's latest challenge to his sentence.  *In re Webster*, 605 F.3d 256, 257-58 (5th Cir. 2010).

Webster then filed an action for federal habeas corpus relief in the Southern District of Indiana, his place of incarceration, arguing that  because the Fifth Circuit had foreclosed him from

---

[3] Ironically, the Fifth Circuit concluded its opinion affirming this court's denial of relief under Section 2255 with the observation "Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him."  421 F.3d at 314.  As explained below, this is precisely what Webster has now done.

filing a successive Section 2255 motion based upon his allegedly newly discovered evidence, he was entitled to pursue such relief.  Initially, the federal district court rejected that argument, relying, as had the Fifth Circuit, on the plain language and legislative history of Section 2255(h). *Webster v. Lockett*, 2013 WL 6007593 (S.D. Ind. Nov. 13, 2013).  A panel of the United States Court of Appeals for the Seventh Circuit affirmed that determination, concluding in part that the new evidence Webster wished to present (information about his application for Social Security benefits based upon a sinus condition filed prior to the date of his offense) could not helpfully be categorized as newly discovered because his trial counsel was aware of Webster's application and Webster's mother testified about his condition at trial,  *Webster v. Caraway*, 761 F.3d 764, 767 (7th Cir. 2014).

On rehearing en banc, by a vote of six to five, the Seventh Circuit reversed, and directed the district court to hold evidentiary hearings to determine whether the Social Security records in question had been available to Webster's trial counsel and whether Webster was, in fact, mentally retarded.  *Webster v. Daniels*, 784 F.3d 1123, 1146 (7th Cir. 2015).  The dissenting judges concluded "[Webster] wants to use § 2241 to make a better factual record and to place his arguments before a different circuit, hoping for a better result."  *Id.*, 784 F.3d at 1150.  The government did not seek certiorari review of the Seventh Circuit's en-banc decision from the United States Supreme Court.

After holding an evidentiary hearing, the Southern District of Indiana found that Webster's Social Security records had not been available to his trial counsel and concluded Webster had satisfied the requirements for filing a Section 2241 action in that court. *Webster v. Lockett*, 2018 WL 4181706 (S.D. Ind. Aug. 31, 2018).  The same court then held a separate evidentiary hearing and concluded, based primarily upon samples of Webster's poor handwriting (which included

extremely poor spelling, grammar, and punctuation), and in disregard of the testimony of multiple mental health experts who had contact with Webster in prison over an extended time period and yet observed nothing to suggest that he was mentally retarded, the district court found that Webster is mentally retarded. *Webster v. Lockett*, 2019 WL 2514833 (S.D. Ind. June 18, 2019). The Seventh Circuit affirmed that determination. *Webster v. Watson*, 975 F.3d 667, 688-89 (7th Cir. 2020). Once again, the Government did not seek certiorari review from the Supreme Court.

Motion to Modify Sentence

On April 30, 2021, Webster filed a motion (albeit styled as a "Joint Advisory to the Court to Modify Bruce Carneil Webster's Sentence of Death to a Sentence of Life Imprisonment") asking this Court to modify his sentence and recommend to the Bureau of Prisons that he be transferred to a federal penal facility near his home in Pine Bluff, Arkansas (ECF no. 1216). The fundamental problem with Webster's Joint Advisory is that he identifies no legal authority authorizing this Court to amend, modify, or otherwise revise the judgment of this Court or the sentence imposed based upon the jury's unanimous verdict of guilt and recommendation that a sentence of death be imposed.

Instead, Webster cites the Fifth Circuit decisions in *United States v. Patterson*, 42 F.3d 246, 248-49 (5th Cir. 2009) (which addressed a district court's authority to re-sentence a criminal defendant without holding a hearing with the defendant physically present following a reversal and remand from the Fifth Circuit); *United States v. Clark*, 816 F.3d 350, 355-56 (5th Cir. 2016) (which addressed a district court's authority to amend a judgment without holding a live hearing to remove a concurrent term of imprisonment on a count where the Fifth Circuit had reversed the defendant's conviction on that count alone but affirmed the defendant's convictions and sentences on four remaining counts that the Fifth Circuit concluded were not intertwined for sentencing

7

purposes with the dismissed count); and *United States v. Lorenzo-Zepeta*, 638 F. App'x 367, 369-71 (5th Cir. Feb. 17, 2016) (which found no plain error where a district court made a finding that sufficient information existed in the record to allow it to sentence a defendant without first obtaining a presentence investigative report).  None of these cases purports to authorize a district court to modify an otherwise final criminal sentence more than two decades after its imposition and affirmation by the circuit court with jurisdiction absent a reversal and remand from that circuit court to review the district court's judgment.

Contrary to the unstated theory underlying Webster's Joint Advisory, this Court does not retain plenary jurisdiction to modify, amend, or otherwise abrogate a final judgment imposing a sentence of death after that judgment has been affirmed on direct appeal and relief under Section 2255 has been denied and likewise affirmed on appeal.  Congress specifically recognized in 18 U.S.C. § 3582(c) that a district court may in limited specific circumstances modify a *term of imprisonment*.  However, when Congress enacted the Federal Death Penalty Act (18 U.S.C. §§ 3591-99), it did not include therein any provision analogous to Section 3582(c).  Likewise, Rule 35 of the Federal Rules of Criminal Procedure authorizes a district court to correct or reduce a sentence only (1)  to correct clerical error or (2) when the defendant has rendered substantial assistance to the Government.  Neither of those authorizations support Webster's "Joint Advisory." Webster identifies no legal authority granting this Court the power to alter, modify, correct, or reduce his sentence at this juncture.

Even the Seventh Circuit in its expansive construction of Section 2241 jurisdiction did not purport to exercise jurisdiction over *this court's* Judgment in Webster's criminal case.  *See Webster v. Daniels*, 784 F.3d at 1145 (recognizing the Fifth Circuit had decided that Webster's current Section 2241 action fell outside the scope of Section 2255(h), stating "we have no quarrel with

that assessment," and concluding "the remaining work on Webster's case must be conducted by the district court for the Southern District of Indiana.").   "We have no authority over the district court in the Northern District of Texas, which lies in the Fifth Circuit."   *Id.*   As the dissenting judges in the Seventh Circuit's en-banc opinion correctly pointed out, Congress enacted Section 2255 in 1948, in part, for the express purpose of avoiding "the unseemly spectacle of federal district courts trying the regularity of proceedings had in courts of coordinate jurisdiction." *Webster*, 748 F.3d at 1147-48 (quoting John J. Parker (chair of the committee which drafted the proposed statute enacted as Section 2255), Limiting the Abuse of Habeas Corpus, 8 F.R.D. 171, 172-73 (1949)).

In making its ruling on the issue of Webster's alleged mental retardation, the Southern District of Indiana effectively substituted its own factual findings (based upon an entirely different set of evidence) for those of the jury and this Court made during Webster's careful and searching trial more than two decades before.  In so doing the federal court in Indiana (1) ignored the jury's unanimous factual determinations at Webster's trial; (2) brushed aside the fact that only four members of Webster's jury found that he was *or may have been* mentally retarded; and (3) declared to be "mentally retarded" the leader of a gang of drug dealers who not only committed a capital offense that involved considerable planning and premeditation, but who also (a) obtained a driver's license and learned to drive a car prior to his arrest, (b) taught himself how to play the guitar while incarcerated, (c) scored in the forty-third percentile on a national academic skills test in middle school, (d) scored at the college freshman level on a pair of standardized tests during his incarceration, (e) quoted from scripture extensively during his incarceration, (f) failed to say or do anything that alerted a pair of prison mental health officials who interacted with him over an extended time period that he was mentally retarded, and (g) was ultimately determined by the

Social Security Administration not to be entitled to benefits as mentally retarded based upon the cryptic conclusions of its own physicians and mental health experts.

Webster seeks to enforce a judgment issued by the United States District Court for the Southern District of Indiana, which was affirmed by the Seventh Circuit but, unlike this Court's judgment imposing a sentence of death and this Court's subsequent order denying Section 2255 relief, has never been reviewed by the United States Supreme Court.  Insofar as Webster wishes to obtain relief from a federal court, he must seek it elsewhere, not from a court that lacks jurisdiction.

Accordingly, (1) Webster's "Joint Advisory to the Court" to Modify Sentence, filed April 30, 2021 (ECF no. 1216), is DISMISSED for want of jurisdiction; and (2) the Pro Hac Vice Applications filed April 30, 2021 by Webster's counsel (ECF nos. 1213 & 1215), and the Motion to withdraw Pro Hac Vice Application filed April 30, 2021 (ECF no. 1214), are all DISMISSED AS MOOT.

SIGNED May 26, 2021.

_____
TERRY R. MEANS
SENIOR UNITED STATES DISTRICT JUDGE